**YHT, INC., an American Samoa Corporation, Plaintiff,**

v.

**PROGRESSIVE INSURANCE CO. (Pago Pago), et al., Defendants.**

High Court of American Samoa
Trial Division

CA No. 92-00

August 18, 2003

Before RICHMOND, Associate Justice, SAGAPOLUTELE, Associate Judge, and MAMEA, Associate Judge.

Counsel: For Plaintiff, Paul F. Miller and Marshall Ashley
 For Defendants, William H. Reardon and Dean Hansell,
 Pro Hac Vice

## OPINION AND ORDER

Plaintiff, YHT, Inc. ("YHT'") seeks payment from Defendant Progressive Insurance Company ("Progressive"), its insurer, for damages caused by a fire at YHT's office. We hold that YHT is not entitled to payment.

## FACTUAL FINDINGS

Based on all the evidence adduced at trial, we make the following factual findings.

On February 23, 2000, a fire destroyed the contents of YHT' s office. The cause of the fire was undoubtedly arson. The signs were clear: an explosion was heard prior to the fire; gasoline containers were found in two different rooms; gasoline residue was found in the bathroom; YHT's

president, Yu Chun Yung ("Yu"), admitted that there were no flammable materials in the building; the extent and speed of the fire indicated it was artificial; and the fire was at night, when it was less likely to be detected and extinguished.

Shortly thereafter YHT looked to cash in on their policy, but Progressive balked. Among other things, Progressive suspected foul play. Specifically, Progressive suspected that YHT, through Yu, had a hand in the arson. Their own investigation, coupled with help of the local authorities, produced several suspicious factors.

At trial, two experts helped put these factors into perspective. The first was Peter Webb ("Webb"). Webb is a claims investigator and loss adjuster. He is trained in basic fire cause and origin investigation and investigation of arson insurance fraud. Throughout his twenty-year career, Webb has investigated hundreds of claims. The other expert was Gary Luff ("Luff"). Luff is a fire expert in New Zealand, and has 19 years experience in the field of fire scene investigation. He has examined over 1,600 fire scenes. Together, their testimony illuminated the suspicious conduct that implicates YHT.

YHT had taken out a $6 million insurance policy with Progressive just six weeks before the fire. The policy only covered damage due to fire and certain natural disasters; YHT did not seek any other coverage (e.g., theft). Furthermore, the policy was rather large, given that the office was modestly sized.

In the weeks leading up to the fire, Yu repeatedly asked a progressive underwriter, Tavita Tamua, whether Progressive could cover a $6 million claim. Also during that time, YHT's business was suffering. It was financially strapped. Yu had just learned that YHT would not be able to export for sale elsewhere in the United States its recently acquired stock of computer chips--which if they were actually in YHT's office at the time of fire, had been smuggled into American Samoa. *See YHT, Inc. v. Progressive Ins. Co.*, 6 A.S.R.3d 108, 110-11 (Trial Div. 2002). Moreover, Yu seemed generally unfamiliar with electronics manufacturing.

After the fire, it was determined that it was set from inside, with no signs of forced entry--the insinuation being that the arsonist entered with a key. Yet the only people who had a key to the office were three YHT principals: Yu, Francis Fomai'i ("Fomai'i"), the landlord of the YRT office building who became a YHT Vice President after the fire, and YHT Vice President Ki Seok Bae ("Sae").

When seeking payment, YHT was evasive and inconsistent. Yu failed to answer 19 questions put to him by Webb and failed to complete the

Claim Form and Schedule of Loss Form Webb furnished him. Furthermore, in the original contract, YHT claimed $60,000 for Plant and Machinery Business Fixtures and Fittings. Yet, at trial, YHT submitted that much of the $60,000 was for leasehold improvements. But Yu could not produce invoices or even details about these improvements.[1] More importantly, Progressive's policy with YHT clearly did not cover leasehold improvements.

YHT also failed to provide much documentation for the tangible property it claimed it lost,[2] the defense being that its records were burned in the fire. Many of these items, such as office chairs and a television set, contained metal parts that would have left discoverable remains. But there were no remains of this kind found at the scene of the fire.

Finally, Luff's testimony also ruled out the possibility of vandalism or revenge. In his opinion, it would be unusual for a vandal or vengeful person to set a fire from within, or even go through the trouble of buying gasoline. And, as already noted, only three people possessed keys to the building. Without evidence of forced entry, Luff was at a loss for how a vandal could have gained access to the office.

## DISCUSSION

 Public policy dictates that if an insured sets fire to his property, either intentionally or willfully, he shall be denied the right to collect from his fire insurance. *See, e.g., Allstate Ins. Co. v. Dorothy McGory*, 697 So. 2d 1171, 1174 (Miss. 1997); 18 GEORGE J. COUCH, COUCH ON INSURANCE § 74:663 (2d ed. 1983) [hereinafter "COUCH"]; A.S.C.A. § 29.1571 ("An insurer is not liable for a loss caused by the willful act of the insured"). The majority rule places the burden on the insurer to prove its claim by a preponderance of the evidence. *See Vexrastro v. Middlesex Co.*, 540 A.2d 693, 695-97 (Conn. 1988); *Rena Inc. v. Brien*, 708 A.2d 747, 751 (N.J. Super. A.D. 1998); COUCH, § 74.667; 44 AM. Jur. 2d *Insurance* § 2017 (1982) [hereinafter "*Insurance*"].

 There are three common elements to this defense: "1) incendiary fire, 2) motive on the part of the insured to destroy the property, and 3) opportunity on the part of the insured to set the fire or to procure the

---

[1] Progressive Senior Vice President, Greg Duffy, testified that it was not unusual for an insurance company to not have ownership information of insured property on file. However, when a claim is submitted, the policyholder is then required to prove ownership to protect against fraud and because insurable interests may have shifted since the time of the policy's inception.
[2] YHT's itemized goods totaled $14,673, about half of which was actually supported by invoices.

setting of the fire by another." *Allstate*, 697 So.2d at 1174, *Rena Inc.*, 708 A.2d at 751 (citing *Alexander V. Tenn. Farmers Mut. Ins. Co.*, 905 S.W.2d 177, 179 (Tenn. Ct. App. 1995)). As might be expected, direct evidence of arson is often elusive; instead, an insurer may rely on circumstantial evidence. *See Don Burton, Inc. v. Aetna Life & Cas. Co.*, 575 F.2d 702, 706-07 (9th Cir. 1975); *Elgi Holding Inc. v. Ins. Co. of N. Am.*, 511 F.2d 957, 959 (2d Cir. 1975); *Allstate*, 697 So. 2d at 1174; *Rena Inc.*, 708 A. 2d at 751; *Insurance*, § 2017; 34 Proof of Facts 3d 291, *Arson Defense* § 4 (1995) ("*Arson Defense*").

## A. Incendiary Origin

As already alluded, we have no doubt that the fire was caused by arson, i.e., that it had an incendiary origin. We need only repeat our findings of facts: an explosion was heard prior to the fire; gasoline containers were found in two different rooms; gasoline residue was found in the bathroom; Yu admitted that there were no flammable materials in the building; the extent and speed of the fire indicated it was artificial; and the fire was at night, when it was less likely to be detected and extinguished. The two experts, Webb and Luff, drew the same conclusion.

## B. Motive to Destroy Property

Our findings also show that YHT had motive to destroy its property. Among other things, business was not good. One of their biggest investments, almost $6 million worth of computer chips, was unmarketable. YHT had also recently taken out a hefty insurance policy. We find that the combination of these circumstances shows motive on the part of YHT. *See, e.g., Beznco Sales & Salvage Inc. v. Gulf Ins. Co.*, 759 S.W.2d 336 (Mo. App. 1988); *Arson Defense*, §§ 6-12.

## C. Opportunity

■ The final prong requires us to determine whether YHT had the opportunity to cause the fire. Two points should be emphasized. First, Progressive need not demonstrate that the insured personally set the fire—though of course that would suffice. Instead, it need only show that the insured had the opportunity to procure the setting of the fire. *See Don Burton, Inc.*, 575 F.2d at 705; *Allstate*, 697 So. 2d at 1174; *Rena Inc.*, 708 A.2d at 751. Secondly, because YHT was a corporation, it can be precluded from recovery on the policy if the fire can be traced to any of its corporate officers. *See* COUCH § 74.679. Thus, YHT can find little solace in the fact that Yu himself was not in the Territory the night of the fire, since its other corporate officer was here. Moreover, Fomai'i testified that he himself was in the office building the night of the fire and that, while Yu was away, Bae also had access to the building.

Therefore, we think the facts support the finding that YHT had the opportunity to set the fire. The most glaring fact is that the fire was set from inside the building, without any evidence of a forced entry. Logically, then, the culprit must have gained access by key. The only people who had a key to office were Yu and Bae, two corporate officers, and Fomai'i. While this evidence does not conclusively show that one of these three started the fire, it at least proves by inference that one of them was involved and had the opportunity to procure the setting of the fire. *See Verrastro*, 540 A.2d at 696-98.

## CONCLUSION

We conclude that Progressive has proved, by a preponderance of the evidence, that the fire which burned down YHT's office had an incendiary origin, and that YHT itself had both motive and opportunity to destroy the building. Accordingly, YHT's claim for recovery on the policy is denied. Because of our holding, we do not reach Progressive's other defenses.

## ORDER

YHT's action is dismissed with prejudice.

It is so ordered.